## In re TELE/RESOURCES, INC., Debtor.

### Bankruptcy No. 80 B 20398.

United States Bankruptcy Court,
S. D. New York.

Oct. 20, 1980.

---

Berman & Zivyak, New York City, for debtor; Jeffrey Zivyak, New York City, of counsel.

Rathheim, Hoffman, Kassel & Levie, New York City, for Citibank; Joseph H. Levie, New York City, of counsel.

Sherman & Citron P.C., New York City, for Creditors' Committee; Howard Karasik, New York City, of counsel.

Coudert Brothers, New York City, for Newmarket Co. Ltd., Peter L. Edwards, New York City, of counsel.

Levin & Weintraub, New York City, for groups of investors; Marilyn Simon, New York City, of counsel.

Siegel, Sommers & Schwartz, New York City, for National Telecon; James A. Beldner, New York City, of counsel.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The debtor, Tele/Resources, Inc., a New York corporation engaged in the manufacture and distribution of telephonic communications systems, has admittedly arrived at the end of its line and is unable to obtain fresh financing or fresh equity. On September 5, 1980, it filed its voluntary petition for an arrangement under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq. The debtor is continuing to lose up to $15,000 per each day of continued operation. The debtor concedes that it cannot continue in business and therefore wishes to accept an offer to purchase its assets proposed by The Acton Corporation ("Acton") of Acton, Massachusetts, whose wholly owned subsidiary, National Telephone Company, Inc., is also engaged in the telephone business. Acton's offer expires today if the court does not authorize its acceptance. The creditors were notified as to this offer and that a hearing would be held in court today to determine the propriety of its acceptance. No other offers were made, although there were some discussions between Citibank, N.A., the largest secured creditor and a third party group. Citibank refused to underwrite this group's purchase possibilities. On the other hand, Citibank affirmatively supports Acton's offer to purchase the debtor's assets for a sum in excess of three and one–half million dollars, which is less than Citibank's secured claim in excess of five million dollars. Citibank withdrew its request for a trustee after the court noted that the additional administration expenses attending the appointment of a trustee were unnecessary, since the debtor also favored the acceptance of Acton's proposal.

Thereafter, the unsecured creditors' committee made an application also returnable today for an order rejecting Acton's offer; enjoining the sale or transfer of the debtor's assets by the debtor or any party other than a trustee in bankruptcy upon proper application; converting the administration of this case from Chapter 11 to Chapter 7 of the Bankruptcy Code and appointing a bankruptcy trustee to administer and liquidate the debtor's business and assets.

### FINDINGS OF FACT

1. The debtor owes in excess of five million dollars to Citibank, subject to a claimed security interest in all personal property, including accounts, inventory, machinery and equipment. The debtor's secured and priority wage and tax claims exceed $5,703,000.

2. The debtor owes its trade creditors approximately $3,650,000 consisting of accounts payable and accrued expenses of $2,600,000 and notes payable of $1,050,000. It also owes approximately $920,000 for deposits and advance billings. It will also owe approximately $250,000 under rejected contracts.

3. In all, the debtor's total liabilities are approximately $10,523,000.

4. The debtor's assets consist of accounts receivable at face value of $2,800,000, less a reserve for bad debts of $700,000; machinery and equipment at $616,000 but worth approximately $150,000 at liquidation value; finished inventory of $1,900,000, but worth approximately $800,000 at distributor prices; work in process of $385,000, which would not be worth the expense of finishing and which would have salvage value only. Thus, the inventory at liquidation value would be worth approximately $957,000.

5. The debtor also has cash of $357,000 (covered by Citibank's lien); intangibles of $192,000 (also covered by Citibank's lien) and a claim for a tax refund amounting to approximately $680,000 (claimed by several secured creditors).

6. If the debtor were liquidated today, there would not be realized more than three million dollars. In such event, the entire liquidated value would be applied in reduction of Citibank's secured claim in excess of five million dollars, with the result that the unsecured creditors would receive nothing. Accordingly, the court cannot ascribe any value to their claims.

7. The debtor is currently losing approximately $15,000 per day in its operations. Its cash flow is nonexistent; Citibank refuses to advance any additional funds.

8. Acton's purchase offer is as follows:
a. The sum of $3,500,000 to be paid to Citibank to release its lien and discharge its debt. Citibank stated at the hearing that pursuant to this transaction it would waive any deficiency claim against the debtor. This point allayed the fears of unsecured creditors that their claims might be further diluted to the extent of a deficiency claim by Citibank.
b. A sum up to $250,000 towards priority tax and wage claims.
c. A sum up to $50,000 for administrative claims.
d. A sum up to no more than 10% of the debt due to unsecured creditors to be paid in four equal annual installments. The amount, if any, to be paid to unsecured creditors is based upon the debtor's financial records prepared as of July 31, 1980.

e. A distribution of Acton's common stock equal to $200,000 market value on the date of closing. These shares are to be held by the debtor in escrow pending a distribution to be ordered by the court, based upon the distribution pattern provided under the Bankruptcy Code. These shares would not go directly to the debtor's shareholders, and therefore, the creditors' committee opposition based on this point is academic.

9. The court finds that the debtor's acceptance of Acton's offer is in the best interest of the estate. Even though Citibank will not be paid in full, it is willing to accept the $3,500,000 now rather than face a liquidation figure that might not even approach $2,500,000. In exchange, it will waive its deficiency claim against the debtor so that the unsecured creditor's position will not be further diluted, thereby leaving open the possibility of some realization for unsecured creditors. Administration expenses and priority wage and tax liabilities will be reduced up to $300,000. Common shares of Acton, valued at $200,000 at the closing, will be made available for distribution. Additionally, all claims directed to the debtor's right to receive a tax refund will not be determined at this juncture and will remain open for future determination. Additionally, and most significantly, the hemorrhaging of business operations at a rate of approximately $15,000 per day will be terminated.

## DISCUSSION

If Citibank had sought to obtain relief from the automatic stay under Code § 362(d), neither the debtor not the unsecured creditors would have been able to provide adequate protection for the depreciating assets as required under Code § 362(d)(1), nor would the debtor have been able to establish an equity in the secured assets and that they are necessary to an effective reorganization, as delineated under Code § 362(d)(2). Indeed, the debtor admits that the value of its estate does not approach the measure of Citibank's secured

claim and further concedes that it cannot continue to operate any longer. Accordingly, had Citibank structured its request for relief under Code § 362(d) it would have been permitted to foreclose upon its lien and sell the assets to whomever it wished, including the potential purchaser, Acton Corporation.

However, in order to avoid delay and for the purpose of ensuring that Acton might obtain the debtor's assets on a going concern and in place basis, Citibank sought to compel the debtor to accept Acton's offer. Not finding any other or better offer, the debtor was quite willing to join Citibank's application for court authority to entertain the Acton offer. Therefore it was unnecessary for Citibank to pursue any further its request for the appointment of a trustee under Code § 1104. Instead, both Citibank, and the debtor appropriately noted that Code § 363 permits a debtor in possession, upon notice and a hearing to sell property of the estate. Moreover, *In re Pure Penn Petroleum Co.*, 188 F.2d 851 (2nd Cir. 1951) is no longer an obstacle to a plan of reorganization that contemplates the complete liquidation of the debtor pursuant to a sale of all of its assets. Code § 1123(a)(5)(B) specifically authorizes the transfer of all or any part of the property of the estate to another entity.

The creditors' committee opposed the sale and, in turn, sought the conversion of this Chapter 11 case to Chapter 7 for liquidation. Their argument for rejection of Acton's offer was predicated on the theory that since the liquidation value of the debtor's assets amounted to approximately two and one-half million dollars, any additional sums to be paid by Acton reflected the debtor's going concern value which is an intangible asset to which Citibank is not entitled. The creditors' committee reasons that the unsecured creditors should receive the benefit of the going concern value. However, since Citibank's pervasive lien extends to intangibles as well, it is obvious that until Citibank realizes the full amount of its secured claim within the meaning of Code § 506(a), it need not defer to any unsecured creditors. Citibank's secured claim exceeds five million dollars, therefore no part of the three and one-half million dollars offered by Acton may enure to the benefit of the unsecured creditors. Any conclusion to the contrary would do violence to Citibank's security interest in favor of junior interests.

That Citibank, Acton and the debtor agree to permit the unsecured creditors to receive a potential distribution up to 10% of their claims is a bonus to which the unsecured creditors would not otherwise be entitled. To the extent that Acton pays up to $300,000 for administration and wage claims and contributes its own common stock up to $200,000 in value for distribution pursuant to the order of this court the estate receives a benefit that would not otherwise be available in the event of liquidation. Moreover additional administration expenses are avoided by dispensing with the appointment of a trustee for purposes of liquidation.

For all intents and purposes, Citibank is the only party in interest affected by a decline in the value of the collateral in question and it favors acceptance of the offer. Its deficiency in excess of the collateral value increases with each day of unprofitable operations. Unless Acton's offer is accepted today a persuasive argument could be made that the offer must be deemed to have expired. No other offer with financial backing is in sight. The debtor cannot continue operating while hoping for another meaningful offer to materialize; operations will have to close down. A dormant debtor is less attractive to any potential purchaser who may be desirous of obtaining a going business; liquidation, as requested by the creditors' committee, is the only alternative. The choice is clear. Liquidation is unacceptable, whereas Acton's offer is acceptable and is in the best interests of the estate.

There was some question as to whether or not Acton's offer included a proposal that the debtor's shareholders might receive any or all of Acton's common shares to be submitted for distribution as part of the trans-

**632**

action. The court emphasized that the debtor's shareholders may not receive any consideration unless the debtor's unsecured creditors are paid in full or give their consent. This point is mandated under the theory of absolute priority, as reflected in the concept of "fair and equitable" with respect to unsecured claims and expressed in Code § 1129(b)(2)(B)(ii). Acton then clarified this point by stating that the offer merely contemplated the possible delivery at the closing date of its common shares, then valued up to $200,000, for distribution as permitted by the court. Acton's offer, with this clarification, does not offend the interests of the unsecured creditors.

### CONCLUSIONS OF LAW

1. The debtor may exercise the right under Code § 363 to sell substantially all of its assets to Acton Corporation in accordance with the terms of Acton's purchase offer, and as agreed to by Citibank.

2. The debtor's shareholders may not receive any shares of Acton Corporation as part of the transaction in question unless and until the unsecured creditors are paid in full or give their consent.

3. The debtor may accept Acton's offer to purchase substantially all of the debtor's assets in accordance with the terms and conditions considered by the court, which this court has found to be fair and reasonable in the circumstances of this case and in the best interests of the estate.

**SUBMIT ORDER ON NOTICE.**